# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

     *Plaintiff,*

     v.                          Case No.  06-CR-49-01

GREGORY S. THOMPSON,

     *Defendant.*

---

## DEFENDANT'S REVOCATION RECOMMENDATION

---

## I.

## BACKGROUND

On March 14, 2007, Gregory Thompson was convicted of one count of bank fraud.  His crime consisted of personally passing (or attempting to pass) checks on which the payee's name had been altered to his name in the total amount of $5,831, a relatively paltry sum by federal court standards.  His co-defendant, Emma Thomas cashed or attempted to cash checks in the amount of $10,719.97, sometimes at the direction of Thompson.  Both Thompson and Thomas passed the checks at the bidding of a man named Herman Jenkins.  Together, the offense conduct constituted $16,540.97.

HURLEY, BURISH & STANTON, S.C.

Jenkins would pay Thompson $200 to $250 for each check he passed. He and his co-defendant passed a total of 15 checks, and attempted to pass two more. His profit from the offense was minimal. His motivation was simple; he was addicted to heroin.

Thompson was sentenced by U.S. District Judge John C. Shabaz to a term of imprisonment of 27 months, the high end of the applicable guideline range. He was also sentenced to a term of supervised release of five years, the statutory maximum.

Thompson finished serving his sentence of imprisonment on September 12, 2008. He was released on supervision in Chicago. Given his poor financial situation, he was ordered to pay $20 per month toward restitution.[1] He made no payments. Thompson's probation officer says that on October 27, 2008, and on November 5, 2008, Thompson tested positive for opiates. He admitted he had been using. He then failed to report for drug testing on November 14, and November 21, 2008; and failed to report for a drug aftercare counseling session on November 24, 2008. On that same date, Thompson called his drug counselor and told him that he was using daily. Thompson does not dispute these allegations.

---

[1] That amounts to $240 per year. For five years of supervision, the probation office expected to collect only $1,200 in restitution. In other words, the expectation from the beginning was that full restitution would never be achieved, and a civil judgment would be entered against Thompson.

Hurley, Burish & Stanton, S.C.

A little more than a year passed when Thompson was arrested in Madison on an outstanding warrant from Dane County on December 30, 2009.[2] Thompson had been living with his eldest daughter, Shirina Thompson, since Thanksgiving of that same year. After a period of sobriety in Chicago, he decided to leave Chicago to escape his heroin use for good, and had come to the relative calm and safety of his family in Madison. He committed no new offense while on supervision.

Thompson refrained from using even after he was released on a furlough to attend his youngest daughter's funeral in Chicago just a few weeks ago. Twanda Thompson was four months pregnant. Her boyfriend shot her and her seven month old son, Jihad. Thompson remains devastated. Upon his return from a weekend filled with sadness none of us wishes to imagine, Thompson tested clean. This is significant because at his most vulnerable moment, Thompson showed his strength and his continued resolve to not go back to using heroin. This is a sign of significant achievement, and bodes well for the future.

Thompson now stands before the Court for violating three terms of his supervision. First, that he abstain from the use of illegal drugs. Second, that he failed to keep in contact with his probation officer. And third, that he left the judicial district without the permission of his probation officer. Thompson does not contest that he violated the specified terms of his supervised release. The sole issue

---

[2] Thompson had an outstanding warrant from a case in Dane County dating back to March 10, 2006; a case that predated his federal conviction. On April 15, 2010, he pleaded guilty to disorderly conduct. See CCAP, Dane County Case No. 2006CM2301.

before the Court is what to do with Mr. Thompson.   Given the nature of the

violations, and Thompson's personal characteristics, there is not an easy answer.

This memorandum discusses the nature of the violations, the appropriate guideline

provisions for revocation and modification, and, ultimately, explains Thompson's

view of what sentence will be "sufficient, but not greater than necessary" to meet the

objectives of 18 U.S.C. § 3553(a), which must be considered if Thompson is revoked.

## II.

## DISCUSSION

**A.      Statutory and Guideline Background.**

After finding that a defendant has violated the terms of his supervised release,

18 U.S.C. § 3583(e) provides the Court with several options.[3]   First, it may extend a

term of supervised release if less than the maximum authorized term was imposed.

§ 3583(e)(2).   Here, Judge Shabaz sentenced Thompson to the maximum term of

supervised release, so this provision does not apply.   Also within § 3583(e)(2), the

Court may "modify, reduce, or enlarge the conditions of supervised release."   *Id.*

Second, the Court may "revoke a term of supervised release, and require the

defendant to serve in prison all or part of the term of supervised release authorized

by statute for the offense that resulted in such term of supervised release . . ."   §

---

[3] The Court may terminate supervised release and discharge a defendant. *See* § 3583(e)(1).
This is presumably done when a court is impressed by a defendant's good behavior, although the
statute does not say as much.

3583(e)(3). Here, then, the Court may either modify the terms of Thompson's supervision, or it may revoke his supervision.

In terms of punishment after revocation, a court may sentence a defendant to a maximum of 3 years in prison if the underlying offense is a class B felony, which is the case here. *See* 18 U.S.C. §§ 1344 and 3559(a)(2). If the Court revokes supervised release, it may also impose an additional term of supervised release after any term of imprisonment. The term of that supervision may not exceed the maximum term of supervision for the underlying conviction (here 5 years) less the term of imprisonment imposed upon revocation. *See* § 3583(h).

The Guidelines classify Thompson's violations as Grade C violations. *See* USSG § 7B1.1(a)(3). These violations constitute the least serious violations. If the Court finds that a Grade C violation has occurred, it may revoke supervised release, or modify the conditions of supervision. § 7B1.3(a)(2). Further, in the event of a Grade C violation, the Court may substitute community confinement or home detention in lieu of imprisonment. § 7B1.3(c). Of course, the guidelines are advisory only.

If the Court revokes Thompson, § 3583(e) instructs that it must fashion a "reasonable" sentence, looking to the factors outlined in 18 U.S.C. § 3553(a) and using the United States Sentencing Guidelines only for advice. *See also Rita v. United States*, 551 U.S. 338 (2007). The district court's core function at sentencing is to examine what is an appropriate sentence for a given offender. Such analysis falls

5          HURLEY, BURISH & STANTON, S.C.

within the district court's exercise of its discretion; the court is not limited to application of the advisory sentencing guidelines. *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007). Indeed, the Supreme Court has had to repeat itself on this point. Most recently it has emphatically stated in a *per curiam* opinion that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original).[4]

The Court is directed to look at the sentencing guidelines as just one factor along with the other factors set forth in 18 U.S.C. § 3553(a). The sentencing guidelines thus became one of seven equally important factors for the Court to consider in determining a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of § 3553(a)(2). All of those considerations are equally relevant in a revocation proceeding.

**B.      Advisory Guideline Range if Revoked.**

If a defendant is revoked for a Grade C violation, and has a criminal history category of VI, the range of imprisonment suggested by the guidelines is 8 to 14 months. § 7B1.4(a). The Court may impose an additional term of supervised release, though it need not. § 7B1.3(g)(2).

---

[4] The Seventh Circuit recognized several years ago that "[t]he sentencing court's 'freedom to impose a reasonable sentence outside the range is unfettered,'" *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006), and "[t]he reasonableness of a sentence is guided by the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Alburay*, 415 F.3d 782, 786 (7th Cir. 2005).

## C.     Recommendation.

Given the underlying offense conduct, the type of violations of supervision, Thompson's characteristics, and the sentencing goals of § 3553(a), the Court should revoke Thompson's supervision, sentence him to a term of imprisonment of 8 months, and order no additional supervision after that term of imprisonment. In short, the Court should punish Thompson for his noncompliance with the terms of his supervision, but it should also make a pragmatic decision that additional supervised release will serve no end but to risk Thompson's passing through the revolving door of federal prison and supervised release for reasons associated only with being a recovering addict. For the following reasons, Thompson should be punished, and then go on his way.

Thompson received a sentence at the high end of the guideline range for his underlying offense. He and his co-defendant profited somewhere between $3,000 and $3,750 from their combined offense conduct. A 27 month sentence was a significant sentence for the nature of the offense. How much more prison time is necessary or justified to punish him for his federal offense?

Thompson recognizes that the issue before the Court is punishment for violating supervision, not for his original offense. But in the end, the federal government's concern here, at some point, is finite. The primary point of supervision in a case involving a financial crime is to achieve restitution. Thompson was ordered to pay $20 a month for a period of five years. That amounts to only

$1,200 of the $13,667.97 ordered. It is apparent that all involved recognized that full restitution would never be achieved given Thompson's circumstances, and a civil judgment would eventually be entered against Thompson. Thus, restitution alone does not justify imposing further supervised release after revocation.

In the end, Thompson's crime was a theft to pay for his drug addiction. It was not a violent offense. After his release, Thompson failed two drug tests in the fall of 2008, then failed to keep in touch with his probation officer, and then turned up in Madison, Wisconsin where he was living at his daughter's house. He committed no new offense. His violations all stemmed from being addicted to heroin.

**D.    Other possible recommendations.**

Counsel understands that the government will ask the Court for an additional 14 months imprisonment and another lengthy period of supervised release. But the government has no real justification for the high end of the guideline range this time around. It suggests to the Court that it punish an addict for being an addict and throw him in prison for the maximum period of time suggested by the guidelines. Recommending prison for the sake of prison, and another extended period of supervision because the law allows for it, serves no good end.

Further, counsel understands that the probation office will be recommending an even lengthier period of incarceration. This, presumably, so that Thompson can get the benefit of the Bureau of Prisons' Residential Drug Abuse Program (RDAP).

Prison for the sake of treatment, however, is misguided.  Thompson assumes that this means a sentence of at least 24 months imprisonment because the BOP requires such a sentence as the minimum amount of time to ensure that a defendant has the opportunity to be accepted into the program.

Recommending a prison sentence to allow for treatment is no doubt well-intentioned.  A careful look at RDAP and how the BOP administers it, however, reveals that it is unlikely Thompson would be allowed in the program.  Nearly doubling Thompson's original sentence based on the hope that Thompson will get treatment in the BOP is unsettling to say the least.  No party to this action has control over placement in the program, including Thomson.  The Court cannot order Thompson to be admitted, neither can the probation office cajole the BOP into accepting Thompson.  Only RDAP decides who gets in.  Moreover, the Court should be wary of assuming that treatment within the confines of prison is what he needs.

Although the BOP Program Statement for RDAP changed slightly in 2009, a good guide to how RDAP works, and its uncertainty as to placement, can be found in *Mora-Meraz v. Thomas*, --- F.3d ---, 2010 WL 1462379 (9th Cir. 2010).[5]  According to 28 C.F.R. § 550.53, an inmate is eligible for RDAP if the inmate: (1) has a verifiable substance use disorder, (2) signs an agreement acknowledging his program responsibility, (3) is able to complete all components of the program, (4) has 24

---

[5] The opinion is attached for the Court's convenience.

HURLEY, BURISH & STANTON, S.C.

months or more remaining on his sentence, and (5) the security level of the residential program institution must be appropriate for the inmate. Neither the statute nor the regulation defines what is a "verifiable substance abuse disorder."

The BOP treatment manual, however, states that an inmate must meet the diagnostic criteria for substance abuse or dependence indicated in the Diagnostic and Statistical Manual of the Mental Disorders, Fourth Edition (DSM-IV). In addition, there must be documentation in the inmate's file which supports the diagnosis. Any written documentation in the inmate's central file which indicates that the inmate used the same substance, for which a diagnosis of abuse or dependence was made via the interview, shall be accepted as verification of a drug abuse problem. *See* Program Statement 5330.11 Ch. 2.5.8 and 2.5.9.[6] Moreover, even if there is substantiating documentation, RDAP may still find the inmate does not have a diagnosis. *See* Program Statement Ch. 2.5.9.

As was litigated in *Mora-Meraz*, there is an unwritten policy "which mandates that the prisoner's file confirm that the inmate used the same substance within twelve months prior to incarceration." *Id.* at *3. "The Bureau requires, that to be eligible for the RDAP, the inmate must show substance dependence or abuse within his last twelve months 'on the street.'" *Id.* This is known as the "twelve-month rule." *Id.*

---

[6] It is attached for the Court's convenience.

Mora-Meraz was diagnosed as meeting the DSM-IV for substance dependence. But since neither his PSR nor his central file contained documentation of drug use during the twelve months prior to his incarceration, he was denied entry into RDAP. *Id.* at *4. He challenged the validity of the rule, but the Ninth Circuit upheld it. In reaching its decision, the Ninth Circuit noted that with no documented proof that an inmate used illegal drugs within twelve months prior to incarceration, "it is reasonable to infer that the inmate is no longer dependant or an abuser." *Id.* at *8. Further, it noted that "[a] person in a substance-free prison does not have access to his or her drug of abuse. While incarcerated, the individual may not exhibit the symptoms of abuse or dependence-ingesting the drug, reducing outside activities . . . there is no way to determine whether this cessation is truly an indication of remission or simply an externally imposed consequence." *Id.* at *9.

Here, Thompson's PSR includes historical information that he had a substance abuse problem. *See* PSR ¶ 94. Also, there is documented evidence that Thompson tested positive for opiates in October and November, 2008. There is no documented evidence, however, that Thompson used heroin within the last twelve months. Accordingly, he will likely fail to meet the "twelve month rule." Thompson would find himself serving yet another lengthy prison sentence without treatment.

A sentence should not be premised on the hope that Thompson will be admitted to RDAP. The uncertainty of the application process is readily apparent from the program statement itself. It is simply a mistake to sentence Thompson on

11          HURLEY, BURISH & STANTON, S.C.

such an uncertain basis.  If five months from now, the parties learn that Thompson was not accepted into the program, then no one would say that the right thing to do was to sentence him to a term of imprisonment of 24 months.

## E.    Conclusion

The desire to get Thompson treatment is well-intentioned.  To sentence him well above the guideline range to afford him the *possibility* of getting treatment in the BOP, though, is misguided.  Indeed, such a recommendation nearly doubles his original sentence for rather benign violations.  The Court should bear in mind, too, that Thompson shared proceeds of only about $3,000 from the underlying offense.  A total sentence of four years imprisonment is significantly disproportionate to the offense conduct and revocation conduct.

Moreover, as the Ninth Circuit recognized in *Mora-Meraz*, time spent in prison is not counted within the DSM-IV analysis of addiction.  The DSM-IV diagnosis includes course specifiers, including what are known as "remission specifiers," that apply only after no criteria for dependance or abuse have been met for at least one month, and never apply if the individual is on prescribed agonist medication, such as methadone, or is in a controlled environment, like a prison.  DSM-IV at 196-97; *see also Mora-Meraz*, at *8-*9.   In other words, part of achieving remission requires access to drugs, and the individual's self-control in not accessing drugs.  Treatment

is best achieved in the community, not behind a barb wire fence.  Thus, even if documented evidence of drug use within the last twelve months is produced, the Court should have serious pause before it concludes that RDAP is the only, or best way to provide effective treatment opportunities to Thompson.

There are limits to the federal interest in imprisoning and supervising a low level offender like Gregory Thompson. We must recognize that some people are not well-suited to supervision.  And if those people pose a minimal risk to society, then the criminal justice system should be pragmatic in utilizing its resources to supervise those people.  Thompson is one of those people.  In 1992, he was discharged unsatisfactorily from probation in Illinois.  His triumph over his addiction, in the end, is his to secure. Perhaps he never will.  We hope he does.  Supervision is good for monitoring certain types of offenders. But the Court should recognize the limits of supervision. We cannot expect the federal government to supervise offenders for addiction issues for their entire lives.  Not even the guidelines provide for such supervision.  And, restitution in this case simply will not be achieved.  So, here we are left with monitoring a twenty year problem with drug addiction as the primary purpose for supervision.  It is better, then, to make a pragmatic decision to punish Thompson with an 8-month term of imprisonment, and terminate his supervised release.

In the end, perhaps the Court must gauge Thompson's character to make its decision. Normally, that is a difficult thing to accomplish in a courtroom. But here, Thompson's tragic circumstances - the murder of his daughter and grandson - provide more insight into his ability to cope with addiction and be a law abiding citizen. Thompson's furlough was his chance to fall apart: to relapse and run away. He didn't. The Court should put great stock in that; punish him for his misdeeds, and send him on his way.

If the Court insists on continued supervision, it should avoid imposing significant imprisonment, and instead insist upon treatment in the community.

## III.

## CONCLUSION

For all the reasons stated above, the Court should revoke Thompson's supervised release, sentence him to a term of imprisonment for eight months, and not impose any additional term of supervised release. Such a sentence is sufficient but not greater than necessary to meet appropriate sentencing objectives in this case.

Dated at Madison, Wisconsin this 12th day of May, 2010.

Respectfully submitted,

Richard A. Coad, Bar # 1052036
Hurley, Burish & Stanton, S.C.
33 East Main St. Suite 400
Madison, WI 53701
Tel: 608-257-0945
Fax: 608-257-5764
E-mail: rcoad@hbslawfirm.com

F:\-clients\Thompson,Greg\sentmemo.wpd

15          HURLEY, BURISH & STANTON, S.C.

Westlaw.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

**H**

United States Court of Appeals,
Ninth Circuit.
Antonio MORA-MERAZ, Petitioner-Appellant,
v.
J.E. THOMAS, Warden, FCI Sheridan, Respond-
ent-Appellee.
No. 09-35413.

Argued and Submitted March 3, 2010.
Filed April 14, 2010.

**Background:** Federal prisoner petitioned for writ
of habeas corpus challenging decision of United
States Bureau of Prisons (BOP) to deny him eligib-
ility for admission to Residential Drug Abuse Pro-
gram ( **RDAP**). The United States District Court for
the District of Oregon, Ancer L. Haggerty, Senior
Judge, 2009 WL 839479, denied petition. Prisoner
appealed.

**Holdings:** The Court of Appeals, Tallman, Circuit
Judge, held that:
(1) promulgation of rule requiring federal prisoner
to present documented proof of substance use with-
in 12 months of imprisonment to be eligible for ad-
mission to **RDAP** was valid interpretive rule to
which BOP did not have to follow notice and com-
ment procedures and
(2) implementation of 12-month rule was neither
arbitrary nor capricious.

Affirmed.

West Headnotes

**[1] Habeas Corpus 197 ⚷─842**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(D) Review
            197III(D)2 Scope and Standards of Re-
view
                197k842 k. Review de novo. Most

Cited Cases
A district court's decision granting or denying a pe-
tition for a writ of habeas corpus is reviewed de
novo. 28 U.S.C.A. § 2241.

**[2] Administrative Law and Procedure 15A ⚷─
797**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative De-
cisions
        15AV(E) Particular Questions, Review of
            15Ak797 k. Legislative questions; rule-
making. Most Cited Cases
Whether an administrative agency pronouncement
is interpretive or substantive for purposes of Ad-
ministrative Procedure Act (APA) is a legal ques-
tion that is reviewed de novo. 5 U.S.C.A. § 553(b).

**[3] Administrative Law and Procedure 15A ⚷─
676**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative De-
cisions
        15AV(A) In General
            15Ak676 k. Record. Most Cited Cases

**Administrative Law and Procedure 15A ⚷─763**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative De-
cisions
        15AV(D) Scope of Review in General
            15Ak763 k. Arbitrary, unreasonable or ca-
pricious action; illegality. Most Cited Cases
The Court of Appeals reviews agency action based
solely on the administrative record and determines
whether the agency has articulated a rational basis
for its decision. 5 U.S.C.A. § 706(2)(A).

**[4] Prisons 310 ⚷─327**

310 Prisons
    310II Prisoners and Inmates

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

310II(H) Proceedings
    310k326 Rulemaking and Rulemaking Proceedings
      310k327 k. In general. Most Cited Cases

Promulgation of rule requiring federal prisoner to present documented proof of substance use within 12 months of imprisonment to be eligible for admission to Residential Drug Abuse Program ( **RDAP**) was valid interpretive rule to which Bureau of Prisons (BOP) did not have to follow notice and comment procedures, since rule, which referred to Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (DSM-IV) and flowed directly from DSM-IV, was not inconsistent with regulation, which in part compelled prisoner to show "verifiable documented drug abuse problem," and instead only sought to clarify language within regulation. 5 U.S.C.A. § 553(b); 18 U.S.C.A. § 3621; 28 C.F.R. § 550.56.

**[5] Administrative Law and Procedure 15A ⬅ 382.1**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(C) Rules and Regulations
        15Ak382 Nature and Scope
          15Ak382.1 k. In general. Most Cited Cases

If an administrative agency rule is inconsistent with or amends an existing legislative rule, then it cannot be interpretive, since it would impose new rights or obligations by changing an existing law, and thus, such a rule must follow the applicable procedures of the Administrative Procedure Act (APA). 5 U.S.C.A. § 553.

**[6] Administrative Law and Procedure 15A ⬅ 797**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
      15AV(E) Particular Questions, Review of

        15Ak797 k. Legislative questions; rulemaking. Most Cited Cases

Under the arbitrary and capricious standard of the Administrative Procedure Act (APA), review of the agency regulation is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision. 5 U.S.C.A. § 706(2)(A).

**[7] Administrative Law and Procedure 15A ⬅ 753**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
      15AV(D) Scope of Review in General
        15Ak753 k. Theory and grounds of administrative decision. Most Cited Cases

Although a court reviewing agency action under the Administrative Procedure Act (APA) is not permitted to supply a reasoned basis for the agency's action that the agency itself has not given, and it cannot read into the agency's silence and make inferences thereupon, a court will not upset the decision on that account if the agency's path may reasonably be discerned even when an agency explains its decision with less than ideal clarity. 5 U.S.C.A. § 706.

**[8] Administrative Law and Procedure 15A ⬅ 404.1**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(C) Rules and Regulations
        15Ak404 Form
          15Ak404.1 k. In general. Most Cited Cases

An agency's actions do not comply with the Administrative Procedure Act (APA) if it fails to articulate a rationale in promulgating rule. 5 U.S.C.A. § 706.

**[9] Prisons 310 ⬅ 201**

310 Prisons
    310II Prisoners and Inmates

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

310II(D) Health and Medical Care
310k201 k. Drug and alcohol treatment.
Most Cited Cases
Reasonable basis existed for decision by Bureau of Prisons (BOP) to adhere to 12-month rule in Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (DSM-IV), and reasonable basis existed for Bureau to apply that rule to require documented use of drug within 12 months prior to incarceration, to determine eligibility for admission to highly intensive Residential Drug Abuse Program (**RDAP**), and thus implementation of 12-month rule was neither arbitrary nor capricious under Administrative Procedure Act (APA), since drug abuse problem had to be verifiable and inmate who had not been using drugs did not have any need for program. 5 U.S.C.A. § 706; 18 U.S.C.A. § 3621; 28 C.F.R. § 550.56.

Stephen R. Sady, Lynn Deffebach (argued), Office of the Federal Public Defender for the District of Oregon, Portland, OR, for the petitioner-appellant.

Kent S. Robinson, Kevin Danielson, Suzanne A. Bratis (argued), Office of the United States Attorney for the District of Oregon, Portland, OR, for the respondent-appellee.

Appeal from the United States District Court for the District of Oregon, Ancer L. Haggerty, Senior District Judge, Presiding. D.C. No. 3:08-cv-00709-HA.

Before RICHARD A. PAEZ, RICHARD C. TALLMAN, and MILAN D. SMITH, JR., Circuit Judges.

TALLMAN, Circuit Judge:

**\*1** Antonio Mora-Meraz ("Mora-Meraz"), a federal prisoner in the custody of the United States Bureau of Prisons (the "Bureau"), appeals the denial of his § 2241 petition for habeas corpus relief. He was convicted of possession of cocaine with the intent to distribute, and was sentenced to 120 months of incarceration. In the district court, he challenged the Bureau's decision to deny him eligibility for admission to the Residential Drug Abuse Program

(the "**RDAP**") at the Federal Correctional Institution at Sheridan, Oregon.

The **RDAP** is an intensive drug abuse program requiring a minimum of 500 hours of treatment apart from the general prison population. Program Statement 5330.10, Chapter 5.1.[FN1] The program utilizes both individual and group therapy sessions and lasts for six to twelve months. *Id.* Additionally, individuals enrolled in the **RDAP** are required to complete transitional courses in a community-based program once placed in a halfway house or on supervised release. *Id.* The **RDAP** is attractive to prisoners because, as an incentive to participate in substance abuse rehabilitation, it grants up to one year sentence credit to those who successfully complete it.

Before the district court, Mora-Meraz claimed that the Bureau's unwritten requirement that he present documented proof of substance use within twelve months of imprisonment was invalid because it was not subject to notice and comment as required by the Administrative Procedure Act ("APA"), and because the Bureau failed to articulate a rational explanation for the requirement. We hold that the Bureau did not run afoul of the APA's procedural requirements and affirm the district court's denial of Mora-Meraz's petition for habeas corpus.[FN2]

I

A

Congress has outlined the terms of federal imprisonment in 18 U.S.C. § 3621. In 1990, the statute was amended to direct the Bureau to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." Pub.L. 101-647, § 2903, 104 Stat. 4789, 4913 (1990) (codified at 18 U.S.C. § 3621(b)).

The Violent Crime Control and Law Enforcement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

Act of 1994 also partially amended 18 U.S.C. § 3621. Under this revision, eligible prisoners are able to participate in substance abuse programming and treatment available while incarcerated in federal institutions. Pub.L. No. 103-322, § 32001, 108 Stat. 1796, 1896-97 (1994) (codified at 18 U.S.C. § 3621(b)(5), (e)). An inmate may be "eligible" for a program such as the **RDAP** if he is (1) "determined by the Bureau of Prisons to have a substance abuse problem," and (2) "willing to participate in a residential substance abuse treatment program." 18 U.S.C. § 3621(e)(5)(B). As "an incentive ... to draw into treatment many inmates who may otherwise not be willing to undergo a difficult and painful treatment program," Congress allowed for a potential one-year sentence reduction upon successful completion of the **RDAP**. H.R.Rep. No. 103-320, at 5 (1993); 18 U.S.C. § 3621(e)(2)(A), (B).[FN3]

*2 The Bureau promulgated a regulation further defining eligibility for the **RDAP**.[FN4] This regulation read, in relevant part:

  (a) Eligibility. An inmate must meet all of the following criteria to be eligible for the residential drug abuse treatment program.

    (1) The inmate must have a verifiable documented drug abuse problem.

28 C.F.R. § 550.56(a) (2008). Neither the statute nor the regulation defines "verifiable documented drug abuse problem."

The Bureau has issued a program statement explaining how it determines whether an inmate has a "verifiable documented drug abuse problem." Under Program Statement 5330.10, Chapter 5.4.1(a)(1), eligibility is based on multiple components. "[D]rug abuse program staff shall ... conduct[ ] the Residential Drug Abuse Program Eligibility Interview followed by a review of all pertinent documents in the inmate's central file to corroborate self-reported information." Program Statement 5330.10, Chapter 5.4.1(a)(1). "The inmate must meet the diagnostic criteria for substance abuse or

dependence indicated in the Diagnostic and Statistical Manual of the Mental Disorders, Fourth Edition, (DSM-IV)." *Id.* Furthermore,

  there must be verification in the Presentence Investigation ... report or other similar documents in the central file which supports the diagnosis. Any written documentation in the inmate's central file which indicates that the inmate *used* the *same substance,* for which a diagnosis of abuse or dependence was made via the interview, shall be accepted as verification of a drug abuse problem.

*Id.*

Since the Bureau bases its substance abuse or dependence diagnosis on the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition Text Revision (2000) ("DSM-IV"), it is important to understand how the DSM-IV classifies substance abuse and dependence. The DSM-IV defines dependence generally as "a cluster of cognitive, behavioral, and psychological symptoms indicating that the individual continues use of the substance despite significant substance-related problems." DSM-IV, at 192. Specifically, the DSM-IV defines dependence as "three or more of the [following] symptoms ... occurring at any time in the same 12-month period": tolerance; withdrawal; increased amount of a substance or elevated duration of ingestion; unsuccessful attempts to cease use; escalated time expenditure securing, using, and recovering from the substance; reduction in outside activities; or continued use despite awareness of the consequences. *Id.* at 192-94. It defines substance abuse similarly to substance dependence, but substance abuse "do[es] not include tolerance, withdrawal, or a pattern of compulsive use and instead include[s] only the harmful consequences of repeated use." *Id.* at 198.

Once dependence or substance abuse has been established, an individual can enter one of the stages of remission if none of the symptoms listed above are present for one month. *Id.* at 195. The DSM-IV

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

uses "specifiers" to qualify the quality and degree of remission. The quality of remission is categorized as either "Early" or "Sustained," and the degree is either "Partial" or "Full."

**\*3** Because the first 12 months following Dependence is a time of particularly high risk for relapse, this period is designated Early Remission. After 12 months of Early Remission have passed without relapse to Dependence, the person enters into Sustained Remission. For both Early Remission and Sustained Remission, a further designation of Full is given if no criteria for Dependence or Abuse have been met during the period of remission; a designation of Partial is given if at least one of the criteria for Dependence or Abuse has been met, intermittently or continuously, during the period of remission.

*Id.* at 192. However, these remission specifiers are not applicable if a person is either on a prescribed agonist medication, such as methadone, or in a controlled environment "where access to alcohol and controlled substances is restricted," such as "closely supervised and substance-free jails." *Id.* at 197.

In addition to the interview with an inmate to evaluate his subjective claims of dependency or abuse, Bureau staff are required to review the inmate's central file and assess whether documented proof supports any initial diagnosis. *See* Program Statement 5330.10, Ch. 5.4.1(a)(1) (stating that following an interview where a diagnosis of dependence or substance abuse is made, any written documentation in an inmate's file which indicates that he or she used the same substance for which that diagnosis was made shall be accepted as verification of that drug abuse problem).

Furthermore, although the regulation and program statement set forth these requirements, the Bureau has also adopted an unwritten policy which mandates that the prisoner's file confirm that the inmate used the same substance within twelve months prior to incarceration. While the central file, including

the PSR, might show use of the same substance at some point during an inmate's past, the Bureau requires, that to be eligible for the **RDAP**, the inmate must show substance dependence or abuse within his last twelve months "on the street." [FN5]

**B**

On February 4, 2002, Mora-Meraz was convicted of possession with the intent to distribute 13.32 kilograms of cocaine in the United States District Court for the Southern District of Texas after he and his daughter were caught carrying drugs across the Mexican border. He was sentenced to a term of 120-months incarceration with the Bureau and five additional years of supervised release. He was imprisoned at the Federal Correctional Institution at Sheridan, Oregon, and is now residing at a halfway house while completing the remainder of his custodial sentence. With credit for good conduct time, his projected release date is November 22, 2010.

A probation officer conducted an investigation prior to Mora-Meraz's sentencing. The presentence investigation report ("PSR") presented to the district court only briefly mentions a history of substance abuse. In its entirety, this section of the report states:

**\*4** Mora-Meraz reported that he tried marihuana [sic] at the age of thirteen, and has never smoked marihuana [sic] again. He also admitted to having tried cocaine once in 1982. The defendant denied any substance abuse issues, and did not believe he would benefit from treatment.

Mora-Meraz claims that this statement underrepresents his actual drug abuse problems and that fear of a harsher sentence caused him to misrepresent his actual prior drug abuse history to both the probation officer and judge.

On January 10, 2008, Mora-Meraz was interviewed by Dr. Neil Solomon, the Bureau's drug abuse program coordinator at Sheridan, to determine his eligibility for the **RDAP**. During this interview, Mora-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

Meraz insisted that he had actually used alcohol once per week for the past thirty-one years, and that his heaviest use was between the ages of 25 and 40. He admitted to having used cocaine more than once per week over the past seventeen years, and that his heaviest use had occurred since his 35th birthday. Finally, he said that he had used marijuana in the past twenty-six years, but not with any frequency. He claimed that he drank alcohol and used cocaine "more than once a week, but not daily" during the "last ... twelve consecutive mo[nth] period on the street."

Though Dr. Solomon recorded that his "diagnostic impression" was negative for either substance abuse or dependence, on September 12, 2008, another Bureau drug abuse treatment specialist noted that, based on Mora-Meraz's self-reporting and a review of the DSM-IV, he would be diagnosable as suffering from both alcohol and cocaine dependence. The Bureau then developed a substance abuse treatment plan for Mora-Meraz which identified problems, goals, and activities for advancement. Mora-Meraz sought admission to the **RDAP**, but was subsequently denied admittance because neither his PSR nor the remainder of his central file contained documentation of either alcohol or cocaine use during the twelve months prior to incarceration.

Mora-Meraz filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2241, alleging that the Bureau had impermissibly denied him admission into the **RDAP**. He claimed that the Bureau's unwritten requirement that a prisoner provide documentation of substance use within the twelve months prior to incarceration was an improper limitation on admittance to a statutorily-created program. After appointing counsel from the Federal Public Defender's Office, the district court denied Mora-Meraz's petition on March 30, 2009.

The court considered whether the so-called "twelve-month rule" was an invalid exercise of the Bureau's discretion under the applicable statutes and regulations. The district court was also asked to determine whether the twelve-month rule violated

the APA. The court answered both questions in the negative, finding first that the rule was reasonable under the applicable statutes and regulations because it relied on the DSM-IV's definition of substance dependence, and second that the rule was not subject to notice and comment because it was an interpretive rule under *Reno v. Koray,* 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995). It concluded that Mora-Meraz had failed to show that the Bureau abused its discretion in denying him admittance to the **RDAP.**

**\*5** Mora-Meraz then filed this timely appeal challenging only the district court's determination that the twelve-month rule is an interpretive rule and thus is not subject to the procedural requirements of the APA.[FN6] We are asked to decide whether the twelve-month rule must comply with the APA's procedural requirements including (1) the need for an agency to provide ample notice and time for comment, and (2) an agency's explanation of its rationale for adopting a particular rule.

## II

[1][2][3] "We review de novo a district court's decision granting or denying a petition for a writ of habeas corpus filed pursuant to [28 U.S.C.] § 2241 ." *Wilson v. Belleque,* 554 F.3d 816, 828 (9th Cir.2009). Also, "[w]hether an agency pronouncement is interpretive or substantive is a legal question that we review de novo." *Gunderson v. Hood,* 268 F.3d 1149, 1154 (9th Cir.2001). Finally, "[i]n reviewing the Bureau's conduct, we consider whether the agency's promulgation of the ... rule is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Arrington v. Daniels,* 516 F.3d 1106, 1112 (9th Cir.2008) (quoting 5 U.S.C. § 706(2)(A)). "We must review the agency action based solely on the administrative record 'and determine whether the agency has articulated a rational basis for its decision.' " *Crickon v. Thomas,* 579 F.3d 978, 982 (9th Cir.2009) (quoting *Tablada v. Thomas,* 533 F.3d 800, 805 (9th Cir.2008)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

### III

[4] Mora-Meraz challenges two distinct requirements within the APA. First, he argues that the Bureau neglected to follow the notice and comment requirements set forth under 5 U.S.C. § 553(b). Second, he insists that even if the notice and comment requirements were met, the Bureau failed to provide an adequate articulated rationale for its promulgation of the twelve-month rule. This, he says, requires that we find the rule "arbitrary and capricious" in violation of § 706 of the APA. We discuss each claim in turn.

### A

The APA places procedural requirements on an agency when it seeks to issue a rule. These procedures include: (1) publication of notice of the proposed rule in the *Federal Register,* 5 U.S.C. § 553(b); (2) a period for interested individuals to comment on the proposed rule, *id.* § 553(c); and (3) publication of the adopted rule not less than thirty days before its effective date, *id.* § 553(d). *Paulsen v. Daniels,* 413 F.3d 999, 1004 (9th Cir.2005). " 'In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment.' " *Id.* (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 316, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)).

[5] However, these notice and comment requirements are not applicable to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). We have made a distinction between so-called "substantive rules" or "legislative rules" and "interpretive rules." "Generally, agencies issue interpretive rules to clarify or explain existing law or regulations so as to advise the public of the agency's construction of the rules it administers." *Gunderson,* 268 F.3d at 1154. However, "[i]f a rule is inconsistent with or amends an existing legislat-

ive rule, then it cannot be interpretive." *Id.* This is because a rule that is inconsistent with a rule promulgated subject to notice and comment would impose new rights or obligations and would require compliance with the § 553 procedures.

*6 Our first question is whether the Bureau's twelve-month rule is substantive-requiring notice and comment-or interpretive-exempt from notice and comment under § 553(b)(3)(A). We have said that the regulation governing the **RDAP**, in this case 28 C.F.R. § 550.56(a) (2008), is clearly substantive, because it "effect[s] a change in existing law or policy." *Gunderson,* 268 F.3d at 1154 (internal quotation marks omitted). However, we have not said the same regarding the Bureau's Program Statement or this specific unwritten rule. Hence, in order to determine whether the challenged rule is substantive, we must ask: "what does the twelve-month rule do?" *See id.*

Mora-Meraz argues that because the twelve-month rule requires agency staff to disqualify any prisoner whose prior use of drugs within the twelve months preceding incarceration is not documented, the rule is categorical and allows for no exceptions or individualized assessment. This, he says, is the indicative mark of a substantive eligibility rule and not of an interpretive rule. We disagree and hold that because the twelve-month rule is not inconsistent with the regulation and instead only seeks to clarify language within the regulation, it is a valid interpretive rule and need not comply with § 553's requirements.

Title 18 U.S.C. § 3621 clearly states that the Bureau is to determine who is eligible for the **RDAP**. 18 U.S.C. § 3621(e)(5)(B)(i) (stating that one condition of eligibility is a finding by the Bureau that the inmate has a substance abuse problem). To do so, the Bureau promulgated 28 C.F.R. § 550.56 (2008), which in part compelled the prisoner to show a "verifiable documented drug abuse problem." *Id.* § 550.56(a)(1). It then defined "verifiable" within its program statement, requiring that an inmate establish documented evidence of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

use of the same substance to corroborate a diagnosis of abuse or dependence consistent with the DSM-IV. Program Statement 5330.10, Chapter 5.4.1(a)(1). In turn, the DSM-IV states that a person is in "Sustained Full Remission" if he exhibits no criteria of abuse or dependence within a twelve-month period, but that remission cannot occur if an individual has been incarcerated in a "closely supervised and substance-free jail[ ]." DSM-IV, at 195, 197. The requirement that an inmate have documented proof that he is a drug abuser who is not in remission at the time he enters a correctional institute flows directly from the DSM-IV. Therefore, the twelve-month rule challenged by Mora-Meraz does "no more than clarify or explain existing law" regarding what it means to have a "verifiable documented drug abuse problem" under 28 C.F.R. § 550.56(a)(1). *Gunderson,* 268 F.3d at 1155 (internal quotation marks omitted).

Because the twelve-month rule is an interpretive rule and the Bureau need not follow notice and comment procedures, it was not error for the district court to deny Mora-Meraz's petition on this ground.

### B

**\*7 [6]** In addition to the notice and comment requirements, the APA also directs that we must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, our review of the [Bureau's] regulation is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.' " *Crickon,* 579 F.3d at 982 (quoting *N.W. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.,* 475 F.3d 1136, 1140 (9th Cir.2007)).

**[7][8]** In *Arrington,* we explained that "[a] reasonable basis exists where the agency 'considered the relevant factors and articulated a rational connec-

tion between the facts found and the choices made.' " 516 F.3d at 1112 (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.,* 415 F.3d 1078, 1093 (9th Cir.2005) (internal citation omitted)). We are not permitted to "supply a reasoned basis for the agency's action that the agency itself has not given." *Crickon,* 579 F.3d at 982. We also may not read into the agency's silence and make inferences thereupon. *Id.* "However, even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Id.* (internal quotation marks omitted). Our job is to rely upon "the administrative record to determine whether the agency has articulated a rational basis for its decision." *Arrington,* 516 F.3d at 1112. If an agency fails to articulate a rationale, we must find that its actions do not comply with the APA. *Crickon,* 579 F.3d at 987.

**[9]** The government argues that because the twelve-month rule is interpretive in nature, it need not comply with the articulated-rationale requirement under § 706. On the other hand, Mora-Meraz claims that our case law declares that all agency rules, whether substantive or interpretive, must comply with this requirement. He relies on a footnote in *Crickon,* where he insists that we invalidated the requirements set forth in a program statement because the Bureau did not provide an articulated rationale as required under § 706. *See id.* at 988 n. 11. Mora-Meraz's argument is misguided. While we did consider the impact of the Bureau's failure to articulate a rationale with regard to the requirement at issue there, our discussion of the program statement was in the context of *Skidmore* deference and not an analysis under § 706. *Id.* Therefore, that case has no bearing on whether interpretive rules are subject to § 706's articulated rationale requirement.

Though the parties focus on this argument, it is not one we need to resolve here because we hold that the Bureau did, in fact, set forth an adequate explanation for the twelve-month limitation on **RDAP** eligibility. Therefore, we need not determine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

whether interpretive rules are always subject to the articulated-rationale requirement.

**\*8** The question we evaluate is whether the Bureau "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington,* 516 F.3d at 1112 (internal quotation marks omitted). Mora-Meraz claims that the Bureau gave no explanation for its decision to condition **RDAP** eligibility on documented proof of substance use within the twelve months prior to incarceration. However, we conclude that the requisite "rational connection" was made by the agency when it incorporated the provisions of the DSM-IV as its benchmark for determining whether an inmate suffers from diagnosable substance abuse or dependence. Program Statement 5330.10, Chapter 5.4.1(a)(1).

Mora-Meraz does not challenge the Bureau's decision to reference the DSM-IV. Instead, he argues that the Bureau failed to clearly articulate its reasons for imposing a temporal limitation on when an individual last ingested drugs or alcohol. More specifically, he claims that the rule that an inmate show documented proof of use within twelve months of incarceration was implemented without the Bureau giving the requisite explanation. One glance at the governing regulation, 28 C.F.R. section 550.56, illustrates why the drug abuse problem must be documented, and a close reading of the DSM-IV explains the rationale for imposing the twelve-month temporal limitation.

First, with regard to the documentation requirement, the regulation in effect at the time read: "The inmate must have a verifiable *documented* drug abuse problem." 28 C.F.R. § 550.56(a)(1) (emphasis added). Therefore, it is no surprise that the Bureau directs the inmate to provide evidence corroborating his alleged drug abuse or dependence problem either within the PSR or the remainder of his central file.

Second, the Bureau's reason for selecting a twelve-month window-and more specifically the twelve

months prior to incarceration-is apparent from the DSM-IV. The DSM-IV explains that the "cessation of Dependence" occurs when the individual enters "Remission." DSM-IV, at 195. A person is said to be in remission if "none of the criteria for Substance Dependence or Substance Abuse have been present for at least 1 month." *Id.* However, "the first twelve months following Dependence is a time of particularly high risk for relapse," and a person is not said to be in "Sustained Full Remission" until the end of that twelve-month phase. *Id.* at 195-96. Once an individual passes the twelve-month mark, he is in Full Remission, defined by the DSM-IV as occurring when "[t]here are no longer any symptoms or signs of the disorder, but it is still clinically relevant to note the disorder." *Id.* at 2. While this is not the same as "recovered," an individual in Full Remission is not in need of medical intervention other than continued evaluation. *Id.*

Following the DSM-IV analysis, the Bureau's rationale for imposing the twelve-month rule is reasonable. Without documented proof that an inmate has used an offending drug within twelve months prior to incarceration, it is reasonable to infer that the inmate is no longer dependant or an abuser. *Id.* at 195. It follows that such an individual has no need for the highly intensive residential drug treatment program, **RDAP**. If the individual believes he still has a need for treatment and assistance, he may enroll in a less comprehensive program offered in the prison.

**\*9** Furthermore, following the DSM-IV, the remission specifiers do not apply once an individual is incarcerated. This makes sense. A person in a substance-free prison does not have access to his or her drug of abuse. While incarcerated, the individual may not exhibit the symptoms of abuse or dependence-ingesting the drug, reducing outside activities, escalated time expended securing the drug, etc.-but there is no way to determine whether this cessation is truly an indication of remission or simply an externally imposed consequence. Thus, the relevant time period the Bureau uses to assess whether an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

inmate is diagnosable as suffering from substance abuse or dependence is the twelve months prior to incarceration.

Here there exists a reasonable basis for the Bureau's decision to adhere to the DSM-IV's twelve-month rule and a reasonable basis for the Bureau to apply that rule to require documented use of a drug within the twelve months prior to incarceration. Therefore, we conclude that the Bureau's implementation of the twelve-month rule was neither arbitrary nor capricious under § 706.

**IV**

Congress realized the pressing need for extensive drug abuse treatment programs within our federal prisons. To ensure that inmates receive crucial treatment for their addictions, Congress provided an incentive for individuals to subject themselves to the rigors of an intensive residential treatment program. But the Bureau is properly concerned with enrolling inmates who genuinely qualify for the therapy and its attending incentive to successfully complete the **RDAP**. Prisoners who are not currently suffering from a clinically diagnosed drug dependency or a recognized substance abuse problem under the DSM-IV protocols should not be permitted to take the place of another who is in greater need of this intensive treatment. The Bureau's rationale for confirming a diagnosis of drug abuse or dependence is clear. The district court correctly denied habeas corpus relief to Mora-Meraz.

**AFFIRMED.**

> FN1. The Bureau has subsequently repealed Program Statement 5330.10, and has now issued new policy statements governing psychology treatment programs and **RDAP** early release benefit procedures. However, these new policy statements took effect on March 16, 2009, and are not retroactive. Because Program Statement 5330.10 was in effect during the Bureau's

evaluation of Mora-Meraz, it is the relevant program statement for this case.

> FN2. Counsel represented at oral argument that Mora-Meraz has since been transferred to a halfway house to serve the last six months of his custodial sentence. Although he can no longer participate in the prison-based **RDAP**, he argues that this appeal is not moot because, if he prevails, he will seek a one-year reduction in his overall sentence. Because we deny his claims on the merits, we need not decide whether the relief he requests is nonetheless available based on his current custodial status.

> FN3. The incentive provision in § 3621 reads: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve." 18 U.S.C. § 3621(e)(2)(B).

> FN4. The regulation has been revised several times and has been amended again since Mora-Meraz was evaluated. Because drug abuse program rules are prospective in nature, *see Bowen v. Hood,* 202 F.3d 1211, 1220-21 (9th Cir.2000); *Cort v. Crabtree,* 113 F.3d 1081, 1085 (9th Cir.1997), the 2008 version is the appropriate regulation to review in this case.

> FN5. It is important to note that the **RDAP** is not the only substance abuse treatment program offered at the Federal Correctional Institution at Sheridan. However, it is the only program offering a potential reduction in an inmate's prison sentence upon successful completion of the program. The twelve-month rule appears to be applicable only to those individuals seek-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576
**(Cite as: 2010 WL 1462379 (C.A.9 (Or.)))**

ing placement in the intensive **RDAP**. Mora-Meraz has participated in a non-residential drug abuse treatment program at Sheridan.

FN6. Mora-Meraz does not appeal the district court's reasonableness determination.

C.A.9 (Or.),2010.
Mora-Meraz v. Thomas
--- F.3d ----, 2010 WL 1462379 (C.A.9 (Or.)), 10 Cal. Daily Op. Serv. 4603, 2010 Daily Journal D.A.R. 5576

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bureau of Prisons
Program Statement 5330.11
[excerpted]

(Available at *http://www.bop.gov/policy/progstat/5330_011.pdf*)

**c. Tangible Incentives**.  If the Warden allows, incentives such as books, t-shirts, greeting cards, notebooks, pens, etc., may be presented to inmates participating in the non-residential drug abuse program.

**2.5. § 550.53  Residential Drug Abuse Treatment Program  (RDAP).**

**2.5.1.  Target Population**.  The RDAP targets the inmate who volunteers for treatment and has a diagnosable and verifiable substance use disorder, and is able to participate in the entire RDAP.

**(a) RDAP.  To successfully complete the RDAP, inmates must complete each of the following components:**

**(1) Unit-based component.  Inmates must complete a course of activities provided by drug abuse treatment specialists and the Drug Abuse Program Coordinator in a treatment unit set apart from the general prison population.  This component must last at least six months.**  To ensure the Bureau provides evidence based treatment in its drug abuse treatment programs, the RDAP is a minimum of 500 hours.  The RDAP has a duration of 9 to 12 months.

**(2) Follow-up services.  If time allows between completion of the unit-based component of the RDAP and transfer to a community-based program, inmates must participate in the follow-up services to the unit-based component of the RDAP.**

**(3) Transitional drug abuse treatment (TDAT) component.  Inmates who have completed the unit-based program and (when appropriate) the follow-up treatment and are transferred to community confinement must successfully complete community-based drug abuse treatment in a community-based program to have successfully completed RDAP.  The Warden, on the basis of his or her discretion, may find an inmate ineligible for participation in a community-based program.**

**(b) Admission Criteria.  Inmates must meet all of the following criteria to be admitted into RDAP.**

a. **(1) Inmates must have a verifiable substance use disorder.**

b. **(2) Inmates must sign an agreement acknowledging program responsibility.**

c. **(3) When beginning the program, the inmate must be able to complete all three components described in paragraph (a) of this section.**  This includes the critical RRC or home confinement transfer to participate in the TDAT.

*Example 1*: A deportable inmate is unqualified for the RDAP because he or she cannot participate in the transitional drug abuse treatment component because he or she is not eligible for RRC placement. The NR DAP program is available for these unqualified inmates.

An inmate previously determined DAP UNQUALIFIED due to his or her ineligibility for an RRC is responsible for notifying the drug abuse treatment staff if there is a change in the inmate's RRC status for reconsideration.

*Example 2*: If an inmate is found to be qualified for the RDAP and has begun to participate in the program, and then finds his or her RRC status to have changed; e.g., a detainer lodged, he or she may remain in treatment.

Inmates who are waiting for, or participating in the RDAP who are not eligible for transfer to an RRC, on or before the date of this policy's implementation, will remain qualified for RDAP participation; and

d. Ordinarily, have 24 months or more remaining on their sentence.

_____

**2.5.2. Staffing.** With the exception of the co-occurring drug abuse treatment program as outlined in Section 2.5.3, DTSs will always maintain a caseload of 1:24.

Residential DAPC's are to manage no more than 120 RDAP participants. This will be implemented as new positions become available.

**2.5.3. Co-occurring Populations.** The Bureau also operates RDAPs for inmates with co-occurring substance use and serious mental health disorders. Questions and referrals for inmates with co-occurring disorders are directed to the Regional Psychology Programs Coordinator. RDAPs that include inmates with co-occurring disorders follow the same programming, policies, and practices of an RDAP with the following exceptions:

- There is an additional track for inmates with a co-occurring diagnosis that focuses on understanding one's disorder, issues with self-medicating and how to manage prescribed medications and medication compliance.
- There is a staff-to-inmate ratio of 1-to-8 for the DTSs who treat and manage these groups.

**2.5.4. Physical/Medical Populations.** Inmates who volunteer for RDAPs and have physical disabilities or medical conditions that require their assignment to a unit other than the RDAP unit to ensure handicap accessibility or medical monitoring may be qualified for the RDAP if the inmate is:

- Otherwise eligible for the RDAP, including eligibility for transitional drug abuse treatment; i.e., an RRC or home confinement placement.
- Able to fully participate in *all* aspects of the RDAP.

- Able to be held accountable to the same standard of treatment and conduct as all other RDAP participants (e.g., complete homework, participate in all assigned groups, behavior consistent with treatment requirements).

Although Health Services staff are always the final decision-maker regarding an inmate's placement outside of the drug treatment unit for medical reasons, drug abuse treatment staff are responsible for identifying, monitoring, and documenting this exception in the inmate's DAP records.  Ordinarily, these inmates are excused from residential drug treatment unit activities only for reasons of sleep and unit accountability purposes (special census counts, etc.).

**2.5.5.  Referral and Redesignation**.  An inmate's initial designation will be made by the Designation and Sentence Classification Center (DSCC) in Grand Prairie, Texas.

Institution DAP Coordinators and Regional Psychology Program Coordinators will monitor waiting lists to ensure inmates are transferred for RDAP with sufficient time to complete the entire RDAP program before their release from Bureau custody, ordinarily at 24 months.

Inmates are to be informed that they may be transferred to any suitable Bureau RDAP based on their release date.  This notification is included in the Agreement to Participate for the RDAP.

Inmates waiting to enter the RDAP who are living on the treatment unit or on an adjacent unit are to adhere to the same unit rules and decorum as those inmates participating in the RDAP.  Ordinarily, if these inmates do not follow the rules and decorum of the RDAP unit, (e.g., negatively impacting other RDAP participants and/or those waiting for RDAP), they will receive a warning of removal from the RDAP waiting list.  This warning will be made during a treatment team meeting with all staff involved in the process.  The DAPC, or designee, will document this warning in PDS.

If the inmate's behavior does not change, he or she will be removed from the RDAP waiting list.  Treatment staff will change the inmate's appropriate SENTRY assignment and document the removal in PDS.

After six months, the inmate may formally reapply for RDAP, through an *Inmate Request to Staff* form (BP-A0148). The application will be considered in a treatment team meeting with the inmate.  The goal of this meeting is to assess any changes in attitude or behavior that the applicant may have made while awaiting re-consideration for the RDAP.  The treatment team will make the decision regarding the inmate's placement on the waiting list.

**2.5.6.  The RDAP Housing Unit**.  RDAPs are separated from the inmate general population.  By living together in a unit where all inmates work together to create a community that supports pro-social attitudes and behaviors, the RDAP unit isolates program participants from the negative peer pressure of the larger prison environment.

Further, the RDAP unit must be solely for RDAP participants, as required by 18 U.S.C. § 3621(e). Inmates living on the RDAP unit must be: waiting for admission into the program; participating in the program; or RDAP completers. Whenever possible, there should be more inmates who are participating in or who have completed RDAP in the treatment unit than those waiting to enter treatment. Any compromise of this defined unit purity will invalidate eligibility for early release of all inmates on the unit.

**2.5.7. Urine Surveillance**. Urine surveillance is a regular component of effective treatment programming. Urine surveillance provides information to staff on an RDAP participant's abstinence, coping mechanisms, and honesty. The Bureau's urine surveillance procedures allow for random testing, suspect testing, and testing after returning from a furlough. Therefore, inmates in the RDAP are subjected to the same urine surveillance procedures as the general population.

On rare occasions there may be a clinical reason to test individual program participants or the entire population of the program. On these infrequent occasions, and with the permission of the Regional Psychology Programs Coordinator, staff may use program funds for urinalysis testing. However, this is to be an extremely rare event and is the only situation where Drug Abuse Program funds may be used for urinalysis testing.

**2.5.8. RDAP Program Admission. § 550.53(c)** *Application to RDAP.* **Inmates may apply for the RDAP by submitting requests to a staff member (ordinarily, a member of the unit team or the Drug Abuse Program Coordinator).**

**(d)** *Referral to RDAP.* **Inmates will be identified for referral and evaluation for RDAP by unit or drug treatment staff.** Typically, inmates are identified for referral to the RDAP by psychology staff or unit management staff.

**(1) Referral to DAPC.** Upon completion of the Psychology Intake Screening, the psychologist will refer inmates with a substance use history and an interest in treatment to the institution's DAPC. The DAPC will further screen the inmate for the RDAP or for referral to the non-residential drug abuse program or the drug education course.

Inmates may also apply for the program by submitting an *Inmate Request to Staff* form to the DAPC.

**(2) Screening.** Upon assignment of a RDAP referral by the DAPC, the DTS will review an inmate's Central File and other collateral sources of documentation to determine if:

- There is sufficient time remaining on the inmate's sentence, ordinarily 24 months.
- There is documentation available to verify the inmate's use of specific drugs, including alcohol.
- There is verification that can establish a pattern of substance abuse or dependence.

- There has been consultation with the Education Department (see Section 2.4.5) and evidence is documented that the inmate cannot participate in the program; e.g., has a cognitive impairment or learning disability that precludes participation or is unable to participate in the program in the language in which it is conducted.
- The inmate can complete all of the components of the RDAP; e.g., is able to participate in community transition drug abuse treatment.

When seeking independent verification, examples of other collateral documentation that may be used include:

- Documentation to support a substance use disorder within the 12-month period before the inmate's arrest on his or her current offense.
- Documentation from a probation officer, parole officer, social service professional, etc., who has information that verifies the inmate's problem with substance(s) within the 12-month period before the inmate's arrest on his or her current offense.
- Documentation from a substance abuse treatment provider or medical provider who diagnosed and treated the inmate for a substance abuse disorder within the 12-month period before the inmate's arrest on his or her current offense.
- Multiple convictions (two or more) for Driving Under the Influence (DUI) or Driving While Intoxicated (DWI) in the 5 years prior to his or her most recent arrest.

The DTS will document a summary of the information gathered from the review and enter it into PDS.

NOTE:  Recreational, social, or occasional use of alcohol and/or other drugs that does not rise to the level of excessive or abusive drinking does not provide the required verification of a substance use disorder.  Any verifying documentation of alcohol or other drug use must indicate problematic use; i.e., consistent with the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Health Disorders (DSM) criteria.

(3)  **No Verifying Documentation**.  In the event there is *no* verifying documentation in the inmate's Presentence Investigation Report or other official documentation in the Central File, the DTS will meet with the inmate.  The DTS will tell the inmate there is no verifying documentation and offer him or her the following information:

> As there is no substantiating documentation for a substance use diagnosis, you have the following options:
>
> 1. You may volunteer for the non-residential drug abuse program.
>
> 2. You may seek documentation from a substance abuse treatment provider where you previously received treatment.  This document must have been written at the time services were provided and must demonstrate that a substance use diagnosis

was completed at the time you were seen, and that treatment was provided for that documented substance abuse diagnosis.

For example, the documentation may not state that the substance abuse treatment provider thought you had an alcohol or other drug problem when he or she saw you for a medical or psychological problem.  Documentation must be sent to, and received by, the drug abuse treatment staff in the institution.  It is not to be sent to you for you to provide to the drug abuse treatment staff.  If the documentation is acceptable, you will be referred to the DAPC for a diagnostic interview.

3. You may seek documentation from a probation officer, a parole officer, a social services professional, etc., who has information that verifies your problem with illegal or illicit substances.  Documentation must be sent to, and received by, the drug abuse treatment staff in the institution. It is not to be sent to you for you to provide to the drug abuse treatment staff.  If the documentation is acceptable, you will be referred to the DAPC for a diagnostic interview.

4. If you have physical proof of your substance use that may be examined by medical staff to prove an addiction, e.g.,  track marks, abscesses, etc., you may sign a consent form allowing the drug treatment staff to receive the results of such examination from Health Services.  If the documentation is acceptable, you will be referred to the DAPC for a diagnostic interview.

5. If you received substance detoxification as you entered the Bureau, you may sign a consent form for the drug treatment staff to verify your detoxification with Health Services.

6. Upon obtaining accepted documentation, you will be referred to the DAPC for a diagnostic interview.

**2.5.9.  The Clinical Interview. § 550.53(e)  *Placement in RDAP*.  The Drug Abuse Program Coordinator decides whether to place inmates in RDAP based on the criteria set forth in paragraph (b) of this section.**

If verifying documentation is found or produced, and only then, inmates who volunteer for the RDAP will be personally interviewed by the DAPC.  Interviews will be conducted based on the inmate's proximity to release, ordinarily no less than 24 months from release.

The DAPC will conduct the personal interview and use his or her psychological training to form a clinical judgment to determine if an inmate has a substance use diagnosis (i.e., substance dependence and/or substance abuse) in accordance with the American Psychiatric Association's

Diagnostic and Statistical Manual of Mental Health Disorders, (DSM). All verifying documentation used is to be consistent in time, intensity, and duration with the inmate's self-report.

On the basis of the clinical interview, the DAPC may conclude that the inmate either does or does not have a diagnosis of a substance use disorder. In some instances, the DAPC may find the inmate does not have a diagnosis, even if there is substantiating documentation.

The DAPC must also determine if the inmate can fully engage in treatment; i.e., communicate in English and/or comprehend treatment expectations. An example of those who may not comprehend treatment expectations is an inmate who is cognitively impaired or has a severe learning disability. In some instances, the DAPC may find the inmate cannot fully engage in treatment and does not qualify for the program, even if there is substantiating documentation (see 18 U.S.C. § 3624(f)(4) and 28 CFR §§ 544.40 - 544.44).

The DAPC will document the result of the clinical interview in PDS, including the substance use diagnosis and the diagnostic criteria used to formulate the diagnosis and notify the inmate of the outcome. The DAPC will also ensure the appropriate SENTRY code(s) are entered and the appropriate documents are signed. Appropriate documentation includes the *Agreement to Participate in the Bureau of Prisons Residential Drug Abuse Treatment Program* form (BP-A0749) and the waiver of hearing to modify the court order (modification of the court order is completed on an inmate with a condition of supervised release that does not include a treatment stipulation).

The DAPC will ensure that the appropriate SENTRY code(s) are entered and the appropriate documents are signed. Appropriate documentation includes the *Agreement to Participate in the Bureau of Prisons Residential Drug Abuse Treatment Program* form (BP-A0749) and the waiver of hearing to modify the court order (modification of the court order is completed on an inmate with a condition of supervised release that does not include a treatment stipulation).
*Note*: Inmates with a diagnosis of a substance use disorder are qualified for the RDAP whether or not they are eligible for the early release incentive.

**2.5.10. Program Operations.** The RDAP treatment modules direct the treatment program. Programming consists of a minimum of 500 *contact* hours; i.e., face to face contact between treatment staff and inmate participants, over no less than 9 months of half-day programming. To facilitate the modified therapeutic community, RDAP programming is conducted daily during day watch hours (excluding non-programming days, such as weekends and holidays) for half of the inmate's work day. Supplemental treatment activities may occur during weekday evenings; however, evening treatment activities cannot be used to replace treatment during day watch hours. Treatment begins as soon as the inmate is in DAP PART status in SENTRY.

Treatment staff are required to use the RDAP treatment journals, facilitator guides, manuals, and resource materials. As effective treatment technologies advance, treatment materials may be